Uh, the first case that we have this morning is Greer v. City of Wichita, Kansas. Case number 18-3159 and we'll hear from Ms. Schrag. May it please the court, good morning. This case turns on the quality of evidence in the record concerning the city's motive as to the adverse employment action that it took against my client, plaintiff appellant Angela Greer. That's it. We are searching for the evidence in the record of the city's motive in doing what it did. Now there are three parties in this case that will matter toward this argument and they are Angela Greer and Patricia McDonald, who is the defendant appellee and is the executive director of the Wichita Art Museum, and a woman named Olivia Hensley. And Olivia is an HR person with the City of Wichita. The city's HR person, Olivia Hensley, refused to pass Angela Greer's application for the The application, and this was for a supervisory position, one year of supervisory experience was required. And Angela's application showed that she had supervised two people. It showed on its face that she had supervisory experience. And Susan Leiker of the city's HR department agrees that this qualifies as supervisory experience. Well, counsel, could you just follow up on that? I mean, I think the number two appeared, but there was no written description. Is that correct? And can you help me understand how that might affect the case? There was no written description. The city's application form asked for a number of people supervised, and Angela put two. And then the city's application also asked for duties, didn't ask specifically for supervisory duties, it just put duties. And Angela, bless her heart, wrote down the duties that she had in accordance with her job title, which was a security guard. She didn't put down the actual duties that she had performed for many years. In essence, she was given extra duties, not paid for them, but she did in fact have supervisory experience. But she even admitted in her deposition that she did not indicate that supervisory experience by the description in her job, her application, would you agree with that? That is true. So it seems to me then the issue turns on whether there was any obligation for Ms. Hensley to obtain additional information not contained on the application. Would you agree with that? I would disagree. I don't think it turns on the obligation of Ms. Hensley. I think it turns on what Ms. Hensley was free to do. And I think we're all agreed there was no practice, there was no procedure, there was no policy, there was no procedure. There was just sort of a practice that sort of developed over the years and nobody quite knows where it came from. Senior HR Specialist Susan Leiker calls it an informal thing, as she understands it. She doesn't know whose idea it was. And Lisa White says there's no written policy to the way that Citi evaluates applications. Michelle, let me ask you, I'm sorry to interrupt you, but I did want to, you just referred for the second time to Susan Leiker's deposition testimony a few minutes ago, and I may have said that Susan Leiker had testified in her deposition that the fact that Ms. Greer had said that she supervised two individuals would satisfy the Citi's requirement for supervisory responsibility. What she did was she... Did I mishear you? What she did was she acknowledged this shows supervisory experience. On page 99 and 100, I read her testimony differently, questioned to Susan Leiker. So we would have an ambiguity within the document on Exhibit 13. On the one hand, she says she supervised two employees. On the other, she doesn't spell it out under the duties. Is that what you are telling us? And then there's a colloquy from counsel, and then she answers, I'm going to say yes. So I had read her deposition testimony, perhaps incorrectly, to acknowledge that there was an ambiguity within the application. Not that affirmatively, the fact that she said I supervised two employees would necessarily or could qualify for supervisory responsibility. And that's the problem with this application. There is an ambiguity. There is a discrepancy. Susan Leiker did acknowledge that saying she supervised two people indicates supervisory experience because it's just a common interpretation of the English language. But when you take the number of employees, the representation that she has supervised people, and you compare it with her duties, yes, there is in fact a discrepancy. And the question is, what is the city supposed to do about this discrepancy? Well, and didn't Ms. Hensley, Ms. White, and Ms. Leiker all testify, first, that if there's such a discrepancy, they go with the written description of the job duties, and two, this is a compound question, that they don't contact the applicant and ask for clarification? Not exactly. Okay. Why don't you correct me? What they said, what was said was, is that they take all factors into context when there is a discrepancy, and that there is nothing to prohibit, if there is a discrepancy, there is nothing to prohibit the interviewer simply, or the HR person, simply from sending it on to the interview committee, and they can deal with the discrepancy. It's not mandatory, it's optional, it's just sort of a loose practice that they are free to follow, or not, as they want. But there's nothing in the law that requires them to call, or check, or pass it on under these circumstances. That's true. Okay. And all three of them testified that if they would have done the same thing, they would have disqualified her based on the face of the application, correct? Well, actually, Lisa White later testifies that she has no idea why Olivia Hensley did what she did. In any event, there... Well, she doesn't have any personal knowledge of what's in Ms. Hensley's head, is how I read that. Exactly. That's a different question than what I'm proposing, which is all three of them said, based on how we conduct business, I would have done exactly the same thing that Ms. Hensley did. I would have disqualified the application. And the jury may agree with that, but they don't have to... Well, they can't speculate. You've got to come up with evidence, right? Yes. And to say we would have done the same thing, respectfully, they're speculating what they would have done. Ultimately, the jury gets to look at both of the reasons given by Olivia Hensley as to why she did what she did, and they get to choose which is the more credible. There is substantial evidence in the record to support either reason. And Olivia's assertion that, well, I would have done the same thing even if I hadn't had Patricia on me, that's not sufficient. It's a question of fact. It's a question of motive. And to take this question of fact away from the jury is profoundly unfair. What Olivia said, I mean, in context, we had a situation where Olivia kicked Angela's application, and Angela could not understand why. And she came to Olivia and she said, look, I was a supervisor under my prior boss. I have this supervisory experience. Olivia had actual knowledge that Angela had filled in for the prior supervisor when he was unavailable. I mean, she knew that she had supervisory experience, but there is no interview for Angela. And Angela just, she can't take it, and she kept on and on after Olivia. And finally, Olivia cracks and gives the second reason. In order for the defendants to prevail, the court has to ignore this testimony. Well, let me probe you a little bit about that. I, when I was reading your briefs, I was waiting for you to argue that this policy or practice that your adversary referred to was a pretext. Because when Ms. Greer went to Ms. Hensley, that she explained not passing her application, not based on this practice, but identifying Ms. McDonnell as a tyrant and she wants her right where she is, but you argued that that was evidence of an improper motive, but I didn't see anywhere in your opening and reply brief that you argued that that creates a fact issue on causation. In other words, that it was a pretextual explanation, this practice or policy, because when push came to shove, when she was called upon to account for why she didn't pass the application, it was not a reference to the practice or policy, it was a reference to her being a tyrant and that Ms. McDonnell wanted Ms. Greer right where she is. And you didn't argue that on causation, I don't think. Well, I thought I did and I intended to. In any event, and it's in the briefs, it was in the context of why Olivia was doing what she's doing, Angelica came after her, why, why? And it's in that context that Olivia told her why. I am doing it because these are my instructions from Patricia. She says, you don't know Patricia McDonnell, you don't know her. She comes up to HR up here, she's a tyrant, Patricia's a tyrant and she's throwing fits and she makes all of them scared and she says, well, she wants you right where you are and she makes all of them scared and she said, so with that, and she says, well, she wants you right where you are. So with that being done, you're not going to have, you're not going to go anywhere. And those is my instructions from her. Those are my instructions from her. And that's why that's, you can put in all the applications you want from Olivia's own mouth, we know why she, at least one of the reasons why she did what she did. She did it because those were her instructions from Patricia. I see that I have three minutes left and I'd like to reserve it for rebuttal. Thank you. I think the appellate, I think you all are going to divide your time. That's right, Judge. My name is Jennifer Hill. I'm here on behalf of the city of Wichita, Kansas. My co-defense counsel, Rachel Weta is here for Patricia McDonnell in the Wichita Art Museum. I'm going to argue for about 10 minutes and if I'm not able to stop, then I won't. But if I have five minutes left, I'm going to let Rachel address any additional questions or issues of fact and law that she thinks we need to cover. So we're here today on behalf of the three defendants in this lawsuit. The plaintiff appeals the district court's grant of summary judgment and asked this court to reverse this decision based on what they claim are three disputed facts in the record. And so we can go into the record and look, and what it seems to be in this case is that there really isn't a dispute because we all agree on what the law is. We all agree that you can't discriminate on an application based on someone's military status. And so as we stand here today and we look at this case, what does it come down to? Was Olivia Hensley acting with a motivation and a bias against Ms. Greer due to her military service? Well, we have testimony in the record. We're here on summary judgment. We have to take the facts in the light most favorable to the plaintiff. And we have testimony in the record where Ms. McDonnell, Dr. McDonnell made it very clear, expressly stated that she had a bias based on military service. How can there not be a disputed issue of fact on motive? Well, I think what's interesting to note is that in this case, Dr. McDonnell was hired by the Art Museum in 2012. From 2012 until the time of this application, I asked the plaintiff very specifically in her deposition, identify for me every instance where you believe you have evidence that Dr. McDonnell was biased against you as a result of your military service. She came up with four or five incidents, three of which happened six months or more after this application was even in the record. So we have maybe two offhand comments that McDonnell makes before this application. Then we have Greer's testimony, which is in fact the only evidence in the record is Greer's hearsay summary of this alleged conversation that occurred with Ms. Hensley that Ms. Hensley denies. Wait a minute. That's a fact issue. 801D, doesn't it say that if that it's an admission of a party opponent, if Ms. Greer says Ms. Hensley, an agent of the defendant, said to Ms. Greer about what her supervisor, another agent for the defendant, told Ms. Hensley about the decision not to consider her promotion, why is that? That would be an admission. But it's an admission of a party opponent. Sure. Well, it's an admission of Ms. Hensley on behalf of a defendant, McDonnell. But it comes in. It would come in, absolutely. And I'm not disputing it would come in. What I'm pointing out is that the record is very thin on this military bias. So we have a couple of instances before this application that have to do with military bias. Then we have Olivia Hensley evaluating this application consistent with city of Wichita policies and consistent with other human resource people who evaluate these applications. Are you asking us to weigh the evidence? No, I am not. Because we have to take it that the jury believes, as gospel, the testimony that you just related. Correct. And so there is an opportunity for a court, as a matter of law, to determine that there is not sufficient evidence to support a bias. We argued that to the district court. The district court didn't really address it. We argue it again here. We say that the record is too thin for them to even find a military bias. But even if you don't go there, the plaintiff admits that Olivia Hensley has no military bias. Yeah, but that's like saying she's got a theory of the case, and she didn't argue this other theory of the case. Staub specifically says under USERRA, there is a viable cat's paw theory. Yes. And so she has expressly disavowed that theory, but she has expressly invoked the Staub theory. Correct. And that's the defendant's point, is that every time you remove and you pull that military bias a little farther out from the action that's required, your evidentiary record needs to be stronger. In order to support a cat's paw theory, you have to have some sort of evidence that there was actually an undue influence from Patricia McDonald to Olivia Hensley. What she just talked about. What she talked about. Ms. Hensley, when she was confronted with not passing along her application, explained to Ms. Greer that the reason is Ms. McDonald does not like her continued military service. As long as you remain in the military, you will stay right where you are. She's a tyrant, and you can submit as many applications as you want. Why doesn't that, if credited by a fact finder, constitute reasonable evidence in which a fact finder could infer a causation and improper motive? I think it gets back to the other issue that the plaintiff brings up, which is, is there a legitimate, non-discriminatory basis for the action made? And in this case, it is established. Plaintiff wants to rely extensively on Susan Leiker's deposition testimony. Susan Leiker is not an HR specialist who evaluates applications and determines if they get passed through. But she's a senior specialist for the HR department? What she does is evaluates EEO questions for panels of interviewees. And where did you argue in your brief that Ms. Leiker's deposition testimony should not be considered, even though she's a senior specialist for the HR department, because her particular responsibilities involve EEO complaints, not USERRA complaints? Correct. Do you argue that? We don't argue that in the brief because that's not argued by the plaintiff in their brief. I'm arguing that today as just pointing out a fact that you were correct in Leiker's testimony said, it's inconsistent. I don't know. And then Lisa White says, I don't know why Olivia did what she did, but I would do the same thing. Because the application on its face provides Ms. Greer ample opportunity to explain, why are you qualified for this job? Let's not forget that at the end of the day, the application was in Greer's hands to sell herself to the HR department and say, I'm the best candidate, here's why. But if we've got some discrepancy among White, Leikers, and Greer, or Hensley, don't we kick it to the jury and say, figure it out? I don't think we have. I think it's misconstruing the record to say that we have a discrepancy. What we have here are two people who review applications as a job. Both of them say, I would not pass this through for an interview. And then we have a third person who doesn't review applications for a job who says, it's kind of inconsistent that she put the number two, but then she lists no duties that describe supervisory duties. When I asked the plaintiff at her deposition, why is it that you list your title as security and not second shift supervisor, if that's your claim? All of your performance reviews say your job duty is security guard. Why doesn't it say second shift supervisor? I don't know. I can't give you that. I ask her, why are your duties not including that you're a supervisor when the actual job requires one year supervisor experience? Her testimony is, well, I could have worded that better. I could have done it different. It's because she submitted her application truthfully. Her application says, I'm a security guard, which is what we all agree to. And her job includes reporting to her supervisor, which very blatantly establishes that she is not the supervisor. So a general manager for McDonald's might be a supervisor for that store. But the fact that that general manager reports to his or her supervisor would automatically preclude that general manager from being considered a supervisor because there is no such thing as a mid-level supervisor, right? Not necessarily. If he can explain what his duties were in a way that say, I'm a supervisor, I'm a general manager because I make the time cards. I set the schedule. I correct people when they make a mistake on the job. If he had put that in a description of his duties, then that's a pretty good explanation of the supervisory experience that you have. But when you list as your duties, move quickly, monitor the property, prevent vandalism and fires, that's not a supervisor. Let me ask you this. So hypothetically, if we look at the application to create an ambiguity, and you argue, I think elsewhere in your brief, that there are no situations in which the WAM or the city has contacted the applicant to clarify an ambiguity, correct? Correct. Are there any of those situations in which there was a full day between the date of the application and the date that the application closed? I can't know that. They get 15,000 applications a year. And out of those 2,000, you can't name one. 15,000 applications a year. I can't speak to that. So 15,000 applications, you can't and have not reported to identify a single one in which there was a full day in which WAM or the city could have clarified the ambiguity. What we have, Judge, is Olivia Hensley's testimony that says, I don't even look at the applications until the position is closed. She testifies to that. And the reason why is because what would happen if Olivia Hensley opens the application and says, I don't think this is their best effort. I better call that applicant and tell them they need to try a little harder. Because then you set up a whole new set of favoritism, right? What happens when the human resource person contacts applicant one but not applicant two? What about James McPherson? Well, that's an interesting question that the plaintiff brings up. And the reason it's interesting is checking a box that says you're interested in full-time employment versus part-time disqualify you for a position. It's the city's position that it doesn't. He was qualified for the job. He had just checked a box that said part-time. But if you just went off the face of his application, you would not consider him for a full-time position. The only reason they considered him is they contacted him to find out if he was interested in full-time work, even though he had previously indicated that he only wanted part-time work. He was qualified for the job because of his education, experience, and his listing of his duties on his application. That's a different question than, am I qualified to oversee other people? So if there's no further questions, I'll give the rest of my time to co-counsel. Thank you. Rachel Weta May it please the court. Rachel Weta on behalf of the Wichita Art Museum and Patricia McDonald. I'd like to further address James McPherson. You'll notice in the record, specifically in the email that Olivia Hensley sent that the plaintiff relies on the smoking gun, if you will. Olivia explains directly in that email the difference between Mr. McPherson and Ms. Greer. And that is that the box that was checked is on a portion of the application that could have been don't go back into that pre-filled area and change those answers. So it's possible that he had applied for a prior job and didn't update that area when he chose to apply for a job listed as full-time. So assuming that the applicant knew at the time he applied for this position that it was full-time, that he was otherwise qualified for the position, there was no harm in reaching out to him to make sure that he did in fact want to apply for a full-time position, as opposed to part-time, which he had previously listed. What would have been the harm in contacting Ms. Greer when she submitted her application late on Monday, the applications don't close until the close of business on Tuesday, to contact her just like with Mr. McPherson? Sure. So the difference between Greer and McPherson is that Greer, we would have had to get into our substantive qualifications. And Ms. Leiker testified in her deposition that she would have done it. She has no idea why Ms. Hensley didn't do it. She didn't testify that she would have done it. She testified that there was nothing to prohibit somebody from doing that. And she does not, well, I think you are correct. I'm sorry, I misspoke. But she did testify, did she not? Not only that Ms. Hensley could have done it, but she doesn't know why she didn't. Correct. But I believe she was saying, I won't speculate as to why she didn't. She also discussed the policy that we don't contact applicants after the job posting has closed. Yeah. So on Wednesday, there's no reason that Ms. Hensley would have called. My question is, why didn't she call on Tuesday morning or Tuesday afternoon? That would have required her to review the applications before the posting closed. There's two. Sure. One of which doesn't even want the job. Sure. There are two applicants for this specific position, for Museum Operations Supervisor. But the City of Wichita doesn't just hire for this position. They hire for positions throughout the entire City of Wichita. I believe the record indicates that they get 25,000 applications per year. Did you or your co-counsel ever argue this in your brief? We argued it down below. I'm not possible, or I'm not sure if we argued specifically the number of applications they review every year. We do reference in our brief that it would be unfair to other applicants if we were to reach out to Ms. Greer and not somebody else. So Ms. Greer, coming from a City of Wichita position already, if there were outside applicants, it could look like favoritism for a City of Wichita HR person to reach out to Ms. Greer to further flesh out her qualifications, where we might not do the same for somebody who's outside the City of Wichita purview already. Really, this case comes down to whose obligation is it to make sure the application has the right qualifications listed? Is it the applicant's responsibility to fully fill out their application? Or is it the potential employer's responsibility to make sure that you have listed all of your job requirements? I would also like to point out that the role that she was applying for, the qualification at issue is not, did you have supervisory experience? It's, were you serving in a supervisory capacity? So what we know from Ms. Greer is that she was in the role, the capacity of a custodial guard. Occasionally, she filled in for her supervisor. Occasionally, she testified that she did supervisory duty. She had supervisory experience, according to her. But she was never in a supervisory capacity. She didn't step into the role of the museum operations supervisor. She didn't step into the role of the weekend supervisor. She was always a custodial guard, which is, per the city of Wichita, a non-supervisory role. Are there any other questions I can answer? Thank you, counsel. Thank you. Because the appellee went over one minute and eight seconds, let's give the appellant another one minute and eight seconds. The legal inquiry before this court is not whether Olivia Hensley had a legitimate reason for doing what she did. That's not the standard in a USERRA action. In a USERRA action, the standard is the burden is on the employer to prove that it would have taken the action that it took without regard to the military animus question. The standard is not, I would have done it. I could have done it. I would have been justified in doing it. The standard is, I must prove that, in fact, this is why I did what I did. It's an affirmative defense that the employer has, which makes it, given substantial competent evidence in the record, it makes it impossible for the employer to meet this burden because the jury gets to decide which or both of the two reasons that Olivia Hensley gave were motivating factors. Well, it comes in two ways, doesn't it? On the one hand, you have the burden of persuasion on showing that anti-military animus was a substantial motivating factor. And if the fact finder could find in your favor, then the defendant bears the burden of persuasion on the same action defense, right? Yes, the defendant then bears the burden of proof and persuasion that they would have done what they did regardless. Olivia must convince the jury that she did what she did without Patricia's boot on her neck. And we can all talk about it among ourselves, but ultimately, this has to be a question for the jury because there are two legitimate motivating factors in the record. It's not a matter of, did she have a legitimate basis for what she did? That's not the question in the USERRA case. In the USERRA case, it is, did she do what she did because she was motivated in part by Patricia's military animus? And speaking of that military animus, I believe the district court, in his opinion, did assume that Patricia was, in fact, motivated by military animus. Let's talk some more about James McPherson. Well, before you go there, I mean, I want to focus on the timing of the discussion, the alleged discussion between Dr. McDonald and Ms. Hensley. That was after the application had been rejected, correct? Not necessarily. Okay, it's pretty unclear then. It is unclear. We can't tell, but what we do know is that Olivia told Angela why she did what she did, and she told her that it's because Patricia instructed me to. These are my instructions from Patricia. Well, I'm not sure I read that portion of the record exactly the way you read it, but... Well, what she says... She says pretty clearly, I rejected the application because she wasn't, she didn't meet the requirement of supervisory experience. Well, all right, and then in the context of finding out why, if Olivia had other reasons, what Olivia told Angela was, is Patricia wants, Patricia's a tyrant, she's throwing fits, and she wants you right where you are. So with that being done, you're not going to go anywhere. And those are my instructions from her. And you can put in all the applications you want. That being so, the timing of when Olivia and Patricia had this little conversation doesn't really matter. The testimony from, I believe it was Susan Leiker, is that there was nothing to prevent Olivia either from clarifying this discrepancy either before or after the application had closed, and certainly nothing to prevent her simply from sending it to the interview committee. Remember, this isn't a job interview. All you're trying to do is get the basic minimum qualifications to determine if you should go forward to an interview. And the idea is, it's the interview committee that gets to resolve any discrepancies. And finally... Well, you're 30 seconds over time. I am? Yeah, with red, it's confusing. It's okay, it wasn't your fault. But... Okay, thank you, counsel. This matter was very well presented both in your respective briefs by both sides and well presented by both sides today. Thank you, counsel, for the plaintiff and the defendant. And this matter will be submitted.